Second case of the day, Alston v. City of Madison. Mr. Bentz. Good morning, your honors. May it please the court. My name is Andrew Bentz, pro bono counsel for Mr. Alston in this case. A jury viewing the evidence in this record could conclude that it's more likely than not that defendants forced Mr. Alston into the focused deterrence program because he is black. There are three categories of evidence that support Mr. Alston's claim. First, defendants have admitted under oath that the goal of their program was to target and decrease disproportionate minority confinement. Second, candidates up for selection for the program were identified by racial proxy, that is, gang affiliation, and that gang affiliation mattered. Those who were identified as being in a black gang were all selected, and the one man identified as being in a white gang was not. And third, statistics. Blacks were 1,800 percent. Yeah, your statistics don't really amount to much. I mean, I'll give you the statements of the parties here, but their statistics are totally, well, go ahead and make your argument. Well, I would say on the statistics, your honor, the district court found it striking that 4.5 percent of the Madison population is black, but 86 percent of the population in the program is black. And I think the statistics here are striking. If you look at the arrested population, which is maybe more of an appropriate comparator, which your honor would like, the arrested population is only 37 percent black, but again, compared to the population of the program, it's 86 percent black. And I don't submit that statistics alone would prove the case. As the court explained in Ortiz, you have to look at all of the evidence available. The jury seeing the motive of the program, the statistics, and the fact that individuals were identified by racial proxy, a jury could certainly draw the reasonable conclusion that race was a motivating factor for selecting Mr. Alston for the program. Now, I'd like to turn back to the goal of the program, and the goal of the program was to decrease disproportionate minority confinement. The defendants have never offered an explanation for how their program would do that, and the only explanation that's been offered to any court is that they targeted black individuals to accomplish their goal of decreasing disproportionate minority confinement. And I would encourage my friend on the other side today to explain how their program would do so, would decrease disproportionate minority confinement, without going after minorities. Then, turning to the racial proxies, the racial proxies in this case were that every individual was identified as being in a gang or not, and the individual's gang was listed. And this label only appeared at the very end of the selection process, when they narrowed it down from 18 individuals to 10 individuals. Five individuals were identified as being in a gang. Four were identified as being in gangs such as Black Disciples, Gangster Disciples, and Vice Lord. One individual was identified as being in Hell's Angels. The individuals identified in Black Disciples, Gangster Disciples, and Vice Lord were all chosen. The one individual in the white gang, Hell's Angels, was not selected. And I finally turn back to the statistics. The statistics in this case are as stark as this court has probably seen in a long time. 86% of those in the program were black, and only 4.5% of the Madison population is black. And even if you look at that arrested population, 37% are black, and 86% in the program are black. That's 31 standard deviations away, if you look at the general population and the population in the program. And that means that blacks were 1,800% more likely to be chosen for the program. Is the initial premise, is there a disproportionate number of, what, convictions, incarcerations? What is the original premise of this program? Well, I'm not sure what defendants... No, you said it. What is it? You said it's something, it's the goal of the program. The goal is to decrease disproportionate minority confinement. Okay, is that a fact? That is what Lieutenant Woodmancy, who designed the program... Is there a disproportionate number of black people confined, as opposed to anyone else? Yes. So there is a problem, if somebody discerned there's a problem. That is a problem that defendants wanted to evidently cure, yes. Okay, well, is that, the thing that bothers me is that that may be a noble cause, to try to help and decrease that disproportionate. Well, it may be a noble cause, but the Supreme Court has instructed us to apply strict scrutiny even when it's a beneficial purpose. Is this some sort of affirmative action? They may try to say it's an affirmative action program. I don't know whether they said it or not. I just wondered what's going on. Well, I think that's, the ultimate goal may be beneficial, to decrease the number of minorities that are confined. Okay, at least that's something. Sure, but you have to also look at the effect on the individuals. The effect on the individuals is quite harsh. They're targeted for increased scrutiny, asset seizure, and eventually face judges who have heard about how they've been in and out of the system. And that goes to our due process argument. But on the equal protection claim, I think you have to look at the individuals, not just the goal as to society as a whole. But even that goal is subject to strict scrutiny because it's targeting minorities. And they're not just trying to decrease minority confinement generally. It's the disproportionate minority confinement. So they have to explain how their program would decrease the disproportionate number. Either they have to increase the proportion that are white that are incarcerated or non-black, or they have to increase the people who are incarcerated who are not minority, or they have to decrease the number of minorities who are incarcerated. In regard to Mr. Alston, I guess what they would argue we're trying to do is to keep him from being reconfined because of whatever he did while on probation would be subject to put him back in prison because he breached some of the rules that he was supposed to follow while on probation. I don't know. The thing is apparently this program is in other places around the country, and maybe that's where they got the idea. So I'll let you go on. I'm just curious. It looks like Madison is not known for a place where they aggressively discriminate against people because of their race. And maybe there are some people, whatever the policy is, which we don't engage in here. We try to look at, as you point out, the constitutional impact. So you can go ahead. I'm just looking at this as it's a strange anomaly where maybe it's one of those clichés. We're just trying to help you. Well, he doesn't think so. Well, it certainly didn't help Mr. Alston in the end. He wound up back in jail. You don't know. I don't know that. If he would otherwise be back in prison, then maybe it helped him. But I don't know. You're saying that he's less offensive than some of the others who aren't on the program. Well, certainly. But even if the goal is beneficial, it is still subject to strict scrutiny. They still have to come forward with a compelling interest and show that their program is narrowly tailored to meet that compelling interest. No good deed goes unpunished. Well, perhaps. But that's what the Supreme Court has said. You cannot have a race-based program without surviving strict scrutiny. And so just because Mr. Alston has brought the claim forward does not mean that suddenly the city gets a pass because he was considered a repeat violent offender. Mr. Benz, if it's possible to identify a gang activity in a certain geographic part of any city, let's say Madison, and a decision is made to, as they say, flood the zone with a disproportionate amount of your total police force, and it's a statistical certainty that this is a minority neighborhood in an attempt just to suppress crime, not to have anything other than it not happening. Now, but it creates a police presence and the likelihood of all that police presence has. Would you say that that in and of itself would be the kind of abuse that you think exists here? Absolutely not. That would be some sort of disparate impact claim, which, of course, does not exist under the Equal Protection Clause. But to tweak your hypothetical a bit, it would be we're going to target this area so that we can get more minorities off the street, and when you look at those who are targeted, they're identified by racial proxies and targeted based on those racial proxies, and you have the disparate effect. Well, I'm just trying to create the possibility that a gang activity by a specific gang, which may be identified by race just because of where it operates in a community that's predominantly, let's say, minority, that an aggressive police presence, which is not where you would say the last 10 years of where you spread the force existed, would create the same kind of ill effect that you see here. Well, it might create the same impact at the end of the day, but I don't think they would have liability under that program because they don't have the intent to target people based on their race. The intent is to target those areas that have high crime, and that high crime happens to be associated with gangs of a particular race. But the racial proxies in this case, I would point out, come at the very end of the selection process, and at no point did defendants make a claim that the gang affiliation was a reason people were chosen for the program. It was never a criterion for being selected for the program, and they have still not offered an explanation for why gang affiliation was important to them in the selection process. Did you say there were just 10 that ended up on this after all the screening and everything else? So the initial round was 10 individuals.  What I'm wondering is how many of those, I guess the 55 really, how many of the 55 were black and not in gangs? That I don't know. The 55 of 64 were black, but I don't know how many were in gangs. I can tell you. Well, you make an important thing. It almost got to the impression that everybody who got pinned in this was a gang member. That's not the case apparently. No, that's certainly not the case. We can tell from the first round. So there were 18 up for consideration. Ten were selected. Five people in the 18 were in gangs. Four were associated with black gangs, one with a white gang. Of the 10 that were selected, the four in black gangs were selected. So we know six individuals in the initial 10 that were selected were not in gangs, or at least not known to be in a gang. And only one of them was not black. Well, the one who was not black was not selected. Okay, so the rest of them were not black, or were black. We don't know what that is. Black but not gang members. All we know about the 10 that were selected, other than the four who were associated with black gangs, is that six of them were not in gangs, or at least not associated with a gang. And I guess black. Well, we don't know the number in that 10 that were black. Were there any white people? I'm sorry? White or Hispanic or whatever, non-black. We know at the end of the day, once the program was done, the 64, we know 55 of those were black. Okay, so it's basically nine out of 64. I'm not following where you get the nine from. Okay, 55 out of 64 is your statistic. That's right. So that leaves nine. Nine were not black, that's correct. I would like to keep the rest of my time for rebuttal. Thank you, Mr. Benz. Ms. Harrell? Good morning. May it please the Court. My name is Catherine Harrell. I represent the defendants' appellees, the City of Madison, former Chief of Police Noble Ray, Captain Corey Nelson, Lieutenant Tom Woodmansey, Sergeant Paige Valenta, and Detective Samantha Kellogg. Mr. Alston has made some pretty harsh accusations in this case that none of my clients take lightly. Specifically, he has alleged that the city defendants implemented the focus deterrence program in order to target blacks and to make examples out of them. In essence, he's accusing the individual officers of being racist. If he's going to make these accusations, then he better back them up by facts and supporting law, and he has done neither. He glosses over or completely ignores the applicable law, and the few pieces of evidence he relies on do nothing to support his claims. In addition, he has miscast the nature of this program. It is undisputed that the primary goal and purpose of this program is to target repeat violent offenders in an effort to deter criminal activity and re-offending. It is designed to end cycles of violence. There is no dispute that a small group of offenders in the Madison community use up a majority of the police department's resources and victimize many people. The SIU detectives didn't just throw together this program. They spent a considerable amount of time researching and developing it to address these problems. And one way they went about doing that was offering a number of programs in the areas of job skills, education, housing, mental health treatment, in order to end the cycle of violence. If the city defendants were truly motivated by racist reasons, it makes little sense to offer these community resources. It could be by racial reasons, not racist reasons. That's true. That's true, Your Honor. I want to address a few of the arguments Attorney Bentz raised. He repeatedly states that the goal of the program was to decrease disproportionate minority confinement. That's not the primary goal of the program. Mr. Alston himself has conceded and has admitted in proposed facts that the primary goal was to stop repeat violent offenders. That one consequence of the program may be a positive impact on disproportionate minority confinement does not mean that that's a discriminatory purpose or intent. And the case law on that is quite clear. And I think Mr. Bentz sort of screws up the analysis with respect to how to apply strict scrutiny to that. Strict scrutiny applies in two instances. You have a racial classification. That's one time you can apply it. In a racial classification case, you need not only the identity by a protected class, but you also need to instruct some action or inaction or a benefit or detriment based upon that class. Based upon the crime, you say? Based upon the class, the protected class. So in this case, if the court were to find that somehow gang affiliation is a racial proxy, there needs to be more to apply strict scrutiny under the racial classification test. What you need, I guess, would have been like the SIU detectives telling the selection committee, you need to give more weight to those members of the gangster disciples or you need to choose people if they're gang members or members of the gangster disciples. And there's no evidence that the SIU detectives tried to influence the selection committee in any manner. So I don't... Focus on just one of the questions Judge Falami asked earlier. As far as Madison is concerned, is there a neighborhood that is substantially black and has a lot of crime? Based on my own experience... No, I don't know. I'm trying to look at what they're doing in Madison. Yeah, I think there are several neighborhoods that are probably substantially black and have a high rate of crime, although this program is not targeting potential participants by neighborhood. Well, there are two sides to that. One, there are a lot of people who live there who need protection. Right. There's crime going on and they have to live there. There's people with young children, et cetera. And the police and law enforcement has an obligation to try to protect those people from the crime, and if the crime is focused and those gangs happen to operate there, you name three of them, vice lawyers, the gangster disciples, and black disciples, I don't know who gets in and out of those gangs. A lot of them compete with each other, unfortunately. But if that's what they're trying to do is to reduce that and maybe identifying certain people that participate, maybe they are in these gangs, that they're trying to, I guess, reduce the crime, but that is not just a targeting thing for certain people, it's also protecting a lot of other people. That's what bothers me about this whole program of what they're trying to do and what the intent is. And I guess to address your question about... I mean, a lot of defendants here. Right. Police officers and other people that seem to be sort of ignored in the process here. Right, and I agree. And frankly, Mr. Alston hasn't pointed to any conduct by any of the individual officers that would subject them to any constitutional violations. I think one of the arguments Attorney Betz just made was that the city defendants have still not offered an explanation for why we included gang affiliation. Well, there's a reason for that. That's because the gang affiliation argument was not raised until the second round of Seventh Circuit briefs. This was not an issue before the district court. Therefore, I didn't get declarations and the like from my clients explaining it because it wasn't an issue. And I don't want to get into the whole forfeiture versus waiver issue that's part of this case. However, I do wish to point out that Mr. Alston's not just raising a new legal argument. He's bringing in new facts into the record at the appellate stage, and that is improper. He's more or less asking this court to take judicial notice that the Gangster Disciples is a black gang based on a few articles he submitted. And it's problematic for a couple reasons. One, they didn't raise this below. And the only record evidence we have regarding the racial composition of Madison gangs is that the Gangster Disciples has white members, too. So I think that sort of strips apart his racial proxy argument. If the court would like me to, I can give a brief explanation of why I believe gang affiliation was included, and I think, Your Honor, you were alluding to it. There are a few gangs in Madison that are responsible for a lot of violent crime, including a majority of the shootings that occur in Madison. Because the focused deterrence program focuses in on individuals who commit violent crimes, that's relevant information to know. In addition, as being a member of certain gangs, you are expected to continue to engage in crime. In Chicago, it's more obvious, but it's gangs fighting each other. Right, right, and that's what the shooting violence is in Madison. It's gang versus gang. And there's also this issue, I mean, one of the things the selection committee might consider, at least that our detectives thought they would consider, is the propensity to commit violence in the future. And if somebody is a gang member, and especially of particular gangs, that will indicate perhaps a propensity to commit future crimes because crimes are expected to maintain membership in the gang. So I believe those are the reasons, sort of anecdotally, why the SIU detectives included gang affiliation on the selection forms. Getting back to the strict scrutiny standard of review I briefly spoke about, I did touch on the racial, there's sort of two tests you can use. There's the racial classification and then there's the three-prong test. And I've explained why racial classification doesn't work, and that's because there's no dispute that these detectives instructed the selection committee to take any action or inaction based on the gang affiliation. The other time you can have strict scrutiny apply is when you have a neutral policy that has a discriminatory effect and a discriminatory purpose. And so if we look at this plan as neutral to start, and then we look at discriminatory effect, that brings us into the statistics Mr. Alston's using, and they're flawed, as the court noted. You cannot compare the percentage of black individuals in this program to the percentage of blacks in the Madison community. The reason being that black people in the Madison community are not repeat violent offenders, so it is inappropriate to compare them both. And that sort of strips apart his entire analysis there. Say that again. I didn't hear you. I'm sorry. The last part of your sentence. So that strips away his entire analysis and use of statistics because he's not comparing the appropriate groups. He has to tailor his statistics better to come up with some sort of statistical argument that makes any sense, and he hasn't done that. I see that my time is up, and I want to make sure to leave time for my co-counsel. Thank you. Mr. Kilpatrick. Thank you, Your Honors, and may it please the court. My name is Stephen Kilpatrick. I'm an assistant attorney general with the Wisconsin Department of Justice, and I represent appellee Brian Reynolds. Mr. Reynolds is a probation agent of the Wisconsin Department of Corrections, and he is the only state of Wisconsin employee who is a defendant in this case. Mr. Alston's claim against Mr. Reynolds is that there was a violation of his Fourth Amendment rights, but no dispute of material facts exists. As a matter of law, Agent Reynolds had reasonable suspicion, the key term, that Alston violated the terms of his probation. The district court's order should be affirmed that Alston cannot prove a Fourth Amendment violation against Mr. Reynolds. It is undisputed that Mr. Alston was seized on December 6, 2011, when he turned himself in to City of Madison police. Alston wants this court to focus on the November 23 apprehension request that Mr. Reynolds issued and an alleged dispute of fact with regard to a meeting on November 16. But what is important in a Fourth Amendment seizure case is that Reynolds had reasonable suspicion that Alston violated the terms of his probation at the time of the seizure on December 6. There is undisputed evidence to support reasonable suspicion at that time. On December 6, when he showed up, he had already, what, missed two meetings? That's correct, and I want to focus on going back in time four days previous. On December 2, it is undisputed that Mr. Alston missed a scheduled home visit with Mr. Reynolds. Mr. Alston does not dispute that, below or at this stage. A missed visit is a violation of the terms of his probation, and that provides reasonable suspicion, certainly, for Fourth Amendment purposes. Thus, there can be no violation of the Fourth Amendment because at the time he was seized, he had missed a meeting, which was a term of his probation, that he was required to be there. Moreover, on December 2, it is undisputed, again, that Mr. Reynolds was informed by Madison police that Mr. Alston was a suspect in a battery, allegedly punching a woman, I believe his former victim, in the face and dragging her around. And it is undisputed that Mr. Reynolds was called by Madison police and told that they checked Mr. Alston's residence and was told he did not live there. This is enough, too, for reasonable suspicion. Going back further in time, on November 25, Reynolds told Alston by telephone to report to him that day. The phone went dead. This is undisputed. It's also undisputed that Alston did not report to Mr. Reynolds that day. Again, more evidence, undisputed, that reasonable suspicion existed. That this happened after Mr. Reynolds issued the apprehension request on the 23rd is not important. In other words, that Reynolds did not know about these facts when he issued the apprehension request does not mean that Mr. Alston's seizure was without reasonable suspicion or that he had to reissue the apprehension request after December 2 or after November 25. In fact, plaintiffs don't argue this at all, and I point to page 5 of the district court decision. It simply means that even if Mr. Reynolds did not have reasonable suspicion before issuing the apprehension request, he certainly did afterwards, after November 16. And that apprehension request was still in effect on December 2 when he missed his meeting and on December 6 when Alston was seized. Now these are enough, these facts are enough to affirm the district court. But notwithstanding these undisputed facts, this leads to Alston's claim that there is a material fact in dispute regarding the November 16 meeting, which led to the issuance of the apprehension request. But there are no disputed facts. In response to Mr. Reynolds' proposed findings, Mr. Alston admitted that he missed the home visit. He says, and I quote, Plaintiff Alston recalls rescheduling the office visit just minutes after missing the November 16 home visit. Alston admits in his opening brief here on page 41 that he realized he was supposed to be at the meeting, and Alston called Reynolds and reached him at his office. It's undisputed that he called Defendant Reynolds and told him that he would come to his office after, or they could reschedule. And it's undisputed that when Reynolds visited Mr. Alston's home that morning, he spoke with Alston's roommate, and Mr. Alston was not there. So it is undisputed that he missed a meeting. He was not simply late, as he's trying to characterize that right now. I see that my time is up, and I appreciate your time. All right, thank you, Mr. Kilpatrick. Mr. Bent? My friend on the other side just agreed with Judge Kaney that racial reasons could explain the program, and the fact that we're having this debate here shows that a jury could conclude that it's more likely than not that race was a motivating factor for including Mr. Alston in the program. And that's all that Mr. Alston has to show here. He only has to show that a jury considering the facts that the goal of the program was racial, that the statistics are so stark, and that individuals were identified by racial proxy and the racial proxies mattered, that a jury could conclude, drawing reasonable inferences from that evidence, that race was a motivating factor. And those facts all support Mr. Alston's claim, and nothing that my friend on the other side has said undermines those facts. The argument is that, in this case, race may have been a factor, which they conceded, but it's a positive factor in the sense that they want to reduce the number of incarcerated blacks. It may be a beneficial purpose, but that does not matter under the Equal Protection Clause. Whether it is affirmative action or whether it is negative action against a group of people, if you are targeting people on the basis of their race, strict scrutiny applies, and therefore they would have to come forward with a compelling interest and show that their program is narrowly tailored to that compelling interest. But we're not at that point yet. All we're here to say is that a jury could find that race was a motivating factor for this program. So the jury also find that race was a motivating factor because the people who were most affected by the danger of the crime in those neighborhoods and, I guess, the gangs, happened to be of a common race? I think that's evidence, but I don't think that alone would permit a jury to find that race was a motivating factor because that would conflate disparate impact cases with disparate treatment cases. And the Supreme Court has been very clear that disparate impact is not a viable claim under the Equal Protection Clause. Well, I'm just looking at it from what you say you want to put it to a jury. A jury may look at that and say, well, I hope it worked. I hope there's less crime. I hope the people in that neighborhood are safer. I hope the gangs who are fighting each other will back off or something. I don't know whatever a jury might find after everybody hears the whole case. May I have leave to respond, Your Honor? Of course. The jury may conclude that the officers in the city had a noble purpose in the pursuit of this program, but the evidence would also allow a jury to conclude that a purpose of the program was to target people on the basis of their race. And when you do that, you have to satisfy strict scrutiny. Thank you, Your Honor. Let me just ask this, Mr. Spence. If the program is to address people on probation who have a violent history, is that then the population, the percentage we should look at rather than the city of Madison? I think that that would be a relevant population to look at, absolutely. There's a significant drop from the percentage that you mentioned, you know, the 4.5% figure as contrasted to the majority population. But we're talking about a lot smaller group of people when we're talking about just probation. That's absolutely true. I would point out that in footnote 5 of the opening brief, we do look at the arrested population, the other group we have in this case in the record evidence, and there blacks account for 37%. So from somewhere between the 37% and the 86% in the program, something happened. A jury certainly could conclude that the something that happened was during the program, the selection of individuals for the program. And that is why so many blacks were included in the program, disproportionate to their population and the arrested population. Well, the arrested can be for a lot of things, DUIs and various other things, hit and run. There's a lot of things people can get arrested for. Absolutely, and I'm not relying solely on the statistics. I think a jury looking at those statistics accompanied with the goal of the program and the fact that racial proxies were used could conclude that race was a motivating factor. I don't think statistics carries the day for sure, but statistics is one element of the entire case. Thank you, Your Honor. Thanks to all counsel, Mr. Benz. You have the additional thanks, and Mr. Murray, for accepting the appointment in this case. Thank you.